Norvel H. Lilly, Appellee, v. Grand Trunk Western Railroad Company, Appellant.

Gen. No. 40,882.

Heard in the second division of this court for the first district at the October term, 1939.

Opinion filed November 28, 1941. Rehearing denied December 10, 1941.

WINSTON, STRAWN & SHAW, of Chicago, for appellants; HAROLD A. SMITH and FRANK B. GILMER, both of Chicago, of counsel.

EDWARD B. HENSLEE and SAMUEL COHEN, both of Chicago, for appellee; PAUL R. BROWN, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Norvel H. Lilly, employed as a brakeman by the Grand Trunk Western Railroad Company, fell from

the deck of a locomotive tender while engaged in the course of his duties and was severely injured. He brought suit for damages against the company under the Federal Employers' Liability Act and the Federal Safety Appliance Act. Trial by jury resulted in a general verdict in his favor for $32,500. The court overruled defendant's motion for a judgment *non obstante veredicto* and entered judgment on the verdict. Defendant has prosecuted this appeal.

The accident occurred in the railroad yards of the defendant at Ferndale, Michigan, on the morning of February 6, 1937. The crew had performed various switching operations and made up a train which was set out on a lead track, after which the engine was disconnected and moved over to an adjoining track to take on water. It was part of Lilly's duty as brakeman to fill the tender with water. The engine having stopped at the water tank, Lilly climbed up the ladder on the rear of the tender, and as he reached the top and stepped around the manhole he found that ice had formed on top of the tender. The operation of taking water required him to pull the waterspout over the manhole of the tender by means of a long pole with a hook attached thereto, which was available for that purpose. According to his testimony he had to kick the hook out of the ice, where it had frozen, and after he had knocked all the ice off the hook he braced himself on the ice where he was standing, with his feet astride, reached for the waterspout and started to pull it into position over the manhole. The hook slipped when the waterspout had come part way round and simultaneously his feet slipped on the ice, causing him to lose his balance and fall over the side of the tender to the ground.

Lilly's complaint charged that the railroad company and plaintiff were working in interstate commerce, and alleged five separate acts of negligence forming the basis of his suit. Paragraph 4a charges that while

plaintiff was on the tender of the locomotive taking on water, defendant supplied him with a rod and hook for the purpose of pulling the waterspout around over the deck of the tender, which was "dangerous, defective, turned and twisted and covered with ice." Paragraph 4b charges that the waterspout was defective and dangerous because it was bent out of shape and position. Both of these paragraphs were dismissed on defendant's motion at the close of plaintiff's case, and are therefore not the subject of controversy. Paragraph 4c charged in general terms that there was ice on the deck of the tender which the defendant carelessly, negligently, wrongfully and unlawfully permitted to be there. Paragraph 4d charged that there was a violation of the Safety Appliance Act, in that the tender leaked and the top thereof was covered with ice and was slippery. Paragraph 4e, which was added as an amendment to the complaint, charged that the defendant "operated the locomotive and tender . . . at the point where the water is supplied to and poured into the locomotive, to be cracked, worn and split, so as to occasion and permit the leaking of water from and through this crack, hole and aperture and to flood, seep and cover the top of the tender" where plaintiff worked. Defendant's answer admitted that plaintiff was an employee, but denied that the parties were working in interstate commerce, and also denied the allegations of negligence charged in the complaint.

Under this state of the pleadings there were only two questions before the jury: (1) the allegation that there was a violation of the Safety Appliance Act, in that the tender leaked and was covered with ice, and slippery; and (2) the general charge of negligence in permitting ice to form and remain on the deck of the tender.

The federal statute upon which plaintiff relied provides that "it shall be unlawful for any carrier to

use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb . . . ." (45 U. S. C. A. 79, sec. 23.)

In support of this theory of recovery, Lilly testified in his own behalf that he had been on top of this tender the day before taking on water at Pontiac, Michigan; that he had noticed water on the tender that day, "coming from some place on this engine"; and when asked to describe specifically what he saw he testified: "Well, in front of the manhole where the—that is, the hole that the spout is put down into to take the water, right at the seam on top of the tender where the two join together, there was water coming out of there, at the front of this manhole, right at the seam. It was coming out in a stream, not a big stream, just a small stream like spurting out and spreading over the tender. The manhole is about fifteen or eighteen inches wide and about ten to twelve inches high, about three feet long. The stream of water was coming out from the seam right in front of the manhole, right where the manhole and the top of the tender is riveted together; it was right at the seam, where the two join. It was a very small stream, I will say about like a small nail."

To rebut plaintiff's testimony defendant produced numerous witnesses consisting of the crew and other trainmen who testified that they had inspected the roof of this tender and found no crack or leak in the deck thereof. Among those who so testified were Francis W. Smith, the foreman who took water on the tender both the day before and later in the day after the accident; Percy A. Findley, a brakeman in the crew prior to the arrival of Lilly; A. E. Granger, the engineer; W. D. Darling, foreman of machinery;

P. K. Holton, who filled the tank with water both before and after the accident; Harold Norton and James Russell, inspectors, and several others.

Upon this phase of the case the following interrogatory was submitted to the jury at the request of defendant: "Was there, at the time of the accident in question, a leak in or near the manhole collar on the tender in question?" The jury answered this interrogatory "No," and thus eliminated from the case the claim of negligence as to the leak or crack in the tender.

Plaintiff's counsel argue that the examination of the tender by defendant's witnesses was superficial, and that they could not, by merely visualizing it, accurately determine whether there was a leak in the collar of the manhole where it was riveted to the deck of the tender. It seems to us, however, that this was purely a question of fact which was submitted to the jury, and it answered the special interrogatory adversely to plaintiff's contention. Moreover, plaintiff had testified that the leak was discernible to the naked eye, and that he could see the water streaming out at a point where the collar of the manhole was riveted to the deck of the tender. Defendant's witnesses undoubtedly had the same means of determining whether any leak existed there.

It is also urged that the special interrogatory propounded to the jury was not broad enough to cover the allegations of the complaint, since plaintiff had alleged that "the tender leaked there," and that defendant had operated the locomotive "with the tender . . . at the part where the water is supplied to and poured into the locomotive, cracked, worn and split, so as to occasion and permit the leaking of water from and through this crack, hole and aperture and to flood, seep and cover the top of the tender." While it is true that these allegations are somewhat broader than the language of the special interrogatory, there is no

evidence whatsoever to support them other than the testimony of Lilly which has heretofore been set forth in full, and which is confined exclusively to a "stream of water . . . coming out from the seam right in front of the manhole, right where the manhole and the top of the tender is riveted together . . . where the two join . . . a very small stream . . . about like a small nail." This evidence justified the court in propounding the interrogatory of which plaintiff's counsel complain, fixing the leak "in or near the manhole collar on the tender in question." Any broader interrogatory would not have been justified by plaintiff's own testimony.

Plaintiff's counsel evidently appreciated the import of the special interrogatory, because in his closing argument to the jury he made the following observation, "So, as I say, gentlemen, do not find that there was no leak, or you put him out of court." Notwithstanding this argument, the jury, upon the evidence adduced, found that there was no leak, and consequently that there was no violation of the Safety Appliance Act.

By ruling out any leak "in or near the manhole collar on the tender," there remains only one ground in the complaint upon which the jury could have based its verdict of liability against defendant. That was paragraph 4c, which charged that there was ice on the deck of the tender which defendant "carelessly, negligently, wrongfully and unlawfully" permitted to be there. It is conceded that it had not rained or snowed that day nor the day before. The weather was clear and freezing and from these circumstances plaintiff's counsel now argue that the ice on the tender must have formed through the carelessness of another employee in allowing water to spatter on the deck while filling the tank of the engine before it left Detroit that morning, which froze and formed ice on the way to Ferndale. Plaintiff's counsel are driven to this

argument by reason of the special verdict rendered adversely to plaintiff's testimony that the water on the deck of the tender accumulated there through leakage of the manhole. Although it is conceivable that another employee may have negligently and in violation of the company's rule and usage permitted water to overflow or spatter on the deck of the tender there is no evidence whatsoever to support the argument; it is at best an inference drawn from the fact that it had not rained or snowed that day and therefore the presence of water on the deck, which later formed into ice, could not have gathered there in any other way.

To support a verdict predicated on general negligence in cases of this kind it is always incumbent on the injured party to prove defendant actually had knowledge of the dangerous condition or that it had existed for a sufficient length of time so as to charge defendant with notice. (*Hatton v. New York, N. H. & H. R. Co.*, 261 Fed. 667, 669.) In this proceeding there is no evidence to indicate that defendant or any of its agents or employees knew of the ice or that it had been there long enough to charge them with notice. On the other hand, it is clear that plaintiff knew of the water on the tender because he testified on cross-examination that on February 5, the day preceding the accident, he had observed the leakage of water through the collar of the manhole where it is riveted to the deck and that water had accumulated there. Notwithstanding the rule of the company that the discovery of defects must be reported by employees to their superiors, plaintiff said nothing of the leakage which he says he had discovered. The fact remains, however, that he knew of the water on the deck of the tender, and it is equally clear that neither defendant nor any of its agents or servants had knowledge of this fact.

Defendant's counsel, while stressing these circumstances, take the position that "whether the ice was

there through negligence or whether it was there unavoidably,'' plaintiff cannot recover, because he assumed the risk. Both parties cite numerous decisions in State and Federal courts dealing with the doctrine of assumed risk. The law is clear that a suit predicated upon the Employers' Liability Act or the Safety Appliance Act is governed by the rules laid down in Federal cases. From the discussion by counsel of the doctrine of assumed risk, and an examination of the leading authorities, it is evident that although the defense of assumption of risk is not a favored doctrine, and should not be extended beyond its reasonable limits, it was an established part of the law when this suit was instituted and must be applied in cases fairly within the rule. (39 Corpus Juris, sec. 891, p. 689.) And where a servant's assumption of risk is conclusively established it becomes a question of law so as to preclude recovery. From the numerous decisions cited we gather two fundamental requirements necessary to the application of the doctrine: (1) that the injured party must have had knowledge of the defective conditions; and (2) he must have appreciated the danger which caused his injury. (*Hatton v. New York, N. H. & H. R. Co.*, 261 Fed. 667, 669; *Seaboard Air Line Ry. v. Horton*, 233 U. S. 492, 504; *Jacobs v. Southern Ry. Co.*, 241 U. S. 229; *Boldt v. Pennsylvania R. R. Co.*, 245 U. S. 441, 445.)

As applicable to these decisions there can be no doubt that the plaintiff knew of the icy condition of the tender. He so testified, unequivocally. Moreover, he must have appreciated the danger because he also said that ''I braced myself good, putting my one leg forward and one leg kind of behind me to brace myself good.'' The danger of attempting to stand on the icy surface of the tender and pull a heavy implement from one position to another must have been apparent to plaintiff; otherwise, he would not have had to brace himself, as he testified, to avert slipping. Plaintiff's

counsel propounded the inquiry as to what the law required him to do when he discovered the slippery condition of the tender, by asking, "How must he extricate himself if he appreciates a danger he cannot evade? Is he required to walk off immediately?" This is not the kind of danger employees frequently encounter when a train is in motion and which requires immediate action, nor was it a situation where an unforeseen risk arose. It is not disputed that all railroad crews carry sand or ashes on the engines, and there is nothing to indicate that plaintiff could not have made the surface of the tender safe before taking water. Under the circumstances we are impelled to hold that plaintiff assumed the risk and that the court should have entered judgment notwithstanding the verdict as a matter of law.

This action occurred February 6, 1937. After suit was filed, issues formed, the trial concluded with judgment on the verdict and the appeal perfected in this court, an amendment to the Federal Employers' Liability Act became effective by congressional action and the signature of the president, on August 11, 1939, which by concession removes the defense of assumption of risk in every accident occurring after the amendment to the federal statute was passed, and plaintiff's counsel now urge that this amendment affects and applies retroactively to cases pending on appeal which are not yet finally decided. A considerable portion of the briefs is devoted to a discussion of this question. We find among the decisions some cases where courts have held that if a statute is of a type that can be applied retrospectively the fact that a case is pending on appeal will not affect retrospective application of the new law, but an examination of the decisions convinces us that such statutes deal only with *remedies,* and not with *vested rights.* The Supreme Court of the United States has consistently held, as a fundamental rule of statutory construction,

that a statute is not to be given a retroactive effect unless by plain and definite words of the statute such a construction is unavoidable. In the early case of *United States v. Heth,* 3 Cranch (7 U. S.) 399, the collector of customs prior to the enactment of the statute in June 1800, had received certain sums of money for which he was to be compensated on a percentage basis. By the act of that year his compensation was restricted to a commission of 2½ per cent on the amounts collected. Holding that the statute did not affect the prior transactions, the court said (p. 413): "Words in a statute ought not to have a retroactive operation, unless they are so clear, strong and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied." Later, in *Murray v. Gibson,* 15 How. (56 U. S. ) 421, the court had to pass on a statute of Mississippi, enacted in 1846, which declared that no record of any judgment recovered in a foreign court against a citizen of Mississippi should be received as evidence after the expiration of three years from the time of rendition of the judgment. The Supreme Court held that the statute had no application to a judgment rendered before its passage, and again said (p. 423): "As a general rule for the interpretation of statutes, it may be laid down, that they never should be allowed a retroactive operation where this is not required by express command or by necessary and unavoidable implication. Without such command or implication they speak and operate upon the future only." The same conclusions were reached in *McEwen v. Den,* 24 How. (65 U. S.) 242; *Sohn v. Waterson,* 84 U. S. 596; *United States v. St. Louis, S. F. & T. Ry. Co.,* 270 U. S. 1, 3.

It seems clear to us that the existence of assumed risk as a defense to a suit at law is a vested right and not a remedy because it affects the liability of a railroad to an action upon which a money judgment may

be predicated. The cases relied upon by plaintiff's counsel, as well as quotations from textbook writers, deal almost exclusively with remedies and not with vested rights. The right to a particular remedy may be taken away from litigants by the legislature through amendments which are retrospective, but the cases are uniformly to the effect that the legislature may not destroy a vested right by enactment of a law which operates retroactively. There is nothing in the amendment to the Federal Employers' Liability Act which would justify the assumption that congress intended to make it operative prior to August 11, 1939, the day on which it became effective.

Lastly, it is urged by defendant that at the time of the accident the way freight did not contain interstate cars, and therefore the parties were not engaged in interstate commerce. We have examined the record on this phase of the case and are satisfied that the contention is not well taken. In view of our conclusion on the other points we deem it unnecessary to discuss the point in detail.

In view of the conclusions herein set forth, we are of the opinion that judgment should have been entered on defendant's motion for judgment *non obstante veredicto,* and therefore judgment of the superior court is reversed and the cause is remanded with directions to enter judgment in favor of defendant notwithstanding the verdict of the jury.

*Judgment reversed and cause remanded with directions to enter judgment in favor of defendant non obstante veredicto.*

SCANLAN, P. J., and SULLIVAN, J., concur.